DUKES et al, vs McKENNA et al.

Opinion delivered September 25, 1902.

1. *Indian Lands—Title to—Control of Congress—Constitutionality of.*

    The ultimate title to lands assigned as a place of domicile for a tribe of Indians is in the United States, and subject to the control of Congress; and, therefore, that portion of the Act of Cong. Feb. 16, 1901, (31

Stat. 794) authorizing the courts to grant toll bridge privileges without providing for compensation to the Indian occupants and allottees of the lands used, is not unconstitutional.

Appeal from the United States Court for the Central District.

WILLIAM H. H. CLAYTON, Judge.

Action by G. W. Dukes and others against Edward McKenna and others to restrain the construction and maintenance of a toil bridge within the Indian Territory. Judgment for defendants. Plaintiffs appeal. Affirmed.

On April 27, 1901, the plaintiffs below (appellants here) filed their complaint in equity, and alleged: That plaintiffs brought this action for themselves in their individual capacity and for all the other members of the Choctaw and Chickasaw tribes of Indians. That plaintiff G. W. Dukes is the principal chief of the Choctaw tribe, and plaintiff D. H. Johnston is the governor of the Chickasaw tribe. That the members of the Choctaw and Chickasaw tribes "are the owners in fee simple" of the lands of said tribes, and hold the same in common. That on March 11, 1901, upon petition of defendants, an order was made by the United States Court for the Central District granting to said defendants the "exclusive right to erect and operate a toll bridge over the Poteau river at Page's Ferry." "That said privilege of maintaining said toll bridge and the approaches thereto is of the value of $5,000. That the judgment or order of said court granting said franchise to said defendants is null and void, and was rendered without notice to either of said nations or tribes." That plaintiffs have no remedy at law, and ask that said order be vacated, and that defendants be restrained from taking any steps to construct and maintain said toll bridge. That said

order is as follows: "In the Matter of Granting Privilege to Construct and Operate a Toll Bridge Over Poteau River. On this 11th day of March, 1901, being one of the regular days of holding court at Poteau, Indian Territory, comes on for consideration the petition of Edmund McKenna and W. C. Page, praying that the privilege be granted them to erect and operate a toll bridge over the Poteau river at Page's Ferry, South of the Frisco railroad bridge, within this district, for the term of 20 years. And upon consideration of said petition, as well as evidence introduced by the petitioners, the court finds that a bridge over said river at said point is necessary to accommodate the traveling public, and that to bridge the same at public expense is impracticable; and the court further finds that petitioners, Edmund McKenna and W. C. Page, are suitable and qualified persons to receive the privilege of erecting and operating a toll bridge over said river at said point. It is therefore considered and ordered that the privilege of erecting a toll bridge over said river at said point, together with all necessary causeways leading thereto, and of operating the same, and charging tolls therefor, for the term of 20 years, be, and the same is hereby, granted petitioners, Edmund McKenna and W. C. Page. It is further ordered that work commence upon said bridge and approaches within 90 days. It is further ordered that the maximum rates of toll which the proprietors of said toll bridge and the approaches thereto are entitled to charge for travel over the same be, and the same are hereby, affixed, pending the further order of the court, as follows: Each four-horse team, 35 cents; each two-horse team, 25 cents; each horseman, 10 cents; each head of cattle, 5 cents; each head of sheep or hogs, 3 cents; each footman, 5 cents. (Signed) Wm. H. H. Clayton, Judge Presiding." Defendants answered, and admit they propose to construct and operate a toll bridge at Page's Ferry, "and over the public road leading from Poteau to Ft. Smith, Ark., and said road has been used by the public for the last thirty years as a public road, and that it is necessary to ac-

commodate the traveling public for said bridge to be built. Defendants deny said order is void. Defendants, for further answer state that W. C. Page, a defendant herein, is a recognized citizen of the Choctaw Nation, and owns, as such citizen, and is in the actual possession of the lands over which the bridge is to be built; that he holds the same as his prospective allotment of lands of Choctaw Nation, and owns and cultivates said lands as a farm on both sides of the river where bridge is proposed to be built. (Signed) Frederick & Frederick, Attys. for Defts." On June 22, 1901, plaintiffs filed demurrer to the answer as follows: "Demurrer. Come the plaintiffs, and demur to the answer of the defendants herein, because the same does not state facts sufficient to constitute an equitable defense to the bill of plaintiffs. (Signed) Mansfield, McMurray & Cornish, Attorneys for Plaintiffs." On the same day the court overruled said demurrer, to which plaintiffs excepted, and thereupon the case was submitted upon the following agreed statement of facts.: 'It is agreed by and between plaintiffs and defendants in the above-entitled cause, now pending before the Honorable Wm. H. H. Clayton, judge of the United States Court for the Central District of the Indian Territory, that the following state of facts exist, to wit: That W. C. Page is a citizen of the Choctaw Nation, and is recognized as such by the Choctaw Nation or Tribe of Indians. That he is in possession of the land upon both banks of the Poteau river where the bridge against the building of which the injunction is sought, is to be located, and claims the same as his prospective allotment; and that he is also in the possession of the lands on each side of the road leading to said bridge on both banks of said river, and claims the same as his prospective allotment as a citizen of the Choctaw Nation. That said bridge is sought to be located over said river at the site of the ferry now operated by said W. C. Page, and that a road has crossed said river at said point, and been continuously used as such, for a period of twenty-five or thirty years, and perhaps longer. That defendant McKenna is a

citizen of the United States, and not a member of any Indian
tribe.   We hereby agree that the above statement of facts shall
be filed and become a part of the record in the above-entitled
cause.   (Signed) Mansfield, McMurray & Cornish, for Plaintiffs.
Frederick & Frederick, Attys. for Defts."

"Additional Agreed Statement of Facts.   It is agreed by
and between plaintiffs and defendants in the above-entitled
cause, now pending before the Honorable William H. H. Clayton,
judge of the United States Court for the Central District of the
Indian Territory, that, in addition to the statement of facts
already filed herein, the following state of facts exist, to wit:
That the plaintiff G. W. Dukes is a member of the Choctaw Na-
tion or Tribe of Indians, and is the duly elected, qualified, and
acting principal chief of said nation.   That the plaintiff D. H.
Johnston is a member of the Chickasaw Nation or Tribe of In-
dians, and is the duly elected, qualified, and acting governor of
the Chickasaw Nation or Tribe of Indians.   That said Choctaw
Nation consists of about 15,000 members, and said Chickasaw
Nation of about 6,000 members, and that the members of the
Choctaw and Chickasaw Nations or Tribes of Indians are the
owners in fee simple, to them and their descendants, of the lands
described in plaintiffs' complaint in equity, to inure to them
while they shall exist as a nation and live on it.   We hereby
agree that the above statement of facts shall be filed and become a
part of the record in the above-entitled cause.   (Signed) Mans-
field, McMurray & Cornish, for the Plaintiffs.   Frederick &
Frederick, for the Defendants."   And on the same day the court
rendered the following judgment:   "It is therefore considered,
ordered, and decreed that plaintiffs' bill be, and the same is here-
by, dismissed, with costs to the defendants, for all of which execu-
tion may issue: to which ruling and order of the court the plain
tiff excepts, and prays an appeal herein, which prayer is by the
court granted."

*Mansfield, McMurray* and *Cornish,* for appellants.

*Frederick & Frederick,* for appellees.

TOWNSEND, J.   The appellants insist that the only question involved in this case is the constitutionality of the act of congress of February 18, 1901, the first section of which is as follows:  "Be it enacted by the senate and house of representatives of the United States of America in congress assembled, that section five hundred and four and the succeeding sections down to and including section five hundred and nine, section nine hundred and sixty, and the succeeding sections down to and including section one thousand and thirty-five, of the laws of Arkansas, as published in eighteen hundred and eighty-four in the volume known as Mansfield's Digest of the Statutes of Arkansas be, and the same are hereby, extended over and put in force in the Indian Territory, so far as they may be applicable and not in conflict with any law of Congress applicable to said Territory heretofore passed."   31 Stat. (U. S.) 794, § 1.   The sections of Mansfield's Digest numbered 504 to 509, inclusive, of the Arkansas statute, appellants state "authorize the county courts of that state to grant certain turnpike and toll bridge privileges, where the court found that the public convenience demanded it, and to fix the rates which may be charged by the grantee.   These sections make no provision for compensation to the owner of the fee, because it was contemplated that these privileges would only be granted where public roads already existed in that state; and congress, in seeking to adopt it for use in the Indian Territory, seems to have overlooked entirely making any provision for compensation to the tribes or individual Indians who might be damaged thereby."   The appellants seem to base their contention that the above act is unconstitutional on the ground that congress has overlooked compensation to the owners of the fee. This involves consideration of the question as to what title these tribes have to the lands.   The government of the United States

(12)

have made many treaties and agreements with these tribes or nations of Indians, commencing as early as 1820, and followed by many others. On March 23, 1842, the government issued a patent to the Choctaw Nation, by which it conveyed and granted certain lands to said nation "in fee simple to them and their descendants, to inure to them while they shall exist as a nation and live on it, liable to no transfer or alienation except to the United States or with their consent." Thus early was it evident that the "fee simple" mentioned was a base or qualified fee. That the ultimate title is, and always has been, in the United States, appellants cite article 1 of the treaty of 1855, as follows: "And pursuant to an act of congress, approved May 28th, 1850, the United States do hereby forever secure and guarantee the lands embraced within the said limits, to the members of the Choctaw and Chickasaw tribes, their heirs, and successors, to be held in common; so that each and every member of either tribe shall have an equal, undivided interest, in the whole, provided, however, no part thereof shall ever be sold without the consent of both tribes; and that said lands shall revert to the United States, if said Indians and their heirs become extinct, or abandon the same." 11 Stat. 612. But is there any question as to the power of congress in its wisdom to legislate as it chooses in regard to these tribes or nations of Indians? The Supreme Court of the United States has frequently had this subject under consideration, and, if we correctly apprehend the views expressed and decided by that court, the power of congress is not limited by the stipulations in the various treaties and agreements made with those tribes whenever congress deems it wise and proper to legislate in such way as it may affect the provisions of said treaties or agreements. We herewith cite some of the decisions of that court that, it seems to us, dispose of the question involved in this case as contended by appellants. In Cherokee Nation vs Georgia 5 Pet. 1, 7, 8 L. Ed. 25, Chief Justice Marshall said that these Indian tribes "are considered by foreign nations, as well as by

ourselves, as being so completely under the sovereignty and domain of the United States that any attempt to acquire their lands or to form a political connection with them would be considered by all as an invasion of our territory and an act of hostility." In the case of U. S. vs Kagama, 118 U. S. 375, 379, 6 Sup. Ct. 1109, 1111, 30 L. Ed. 228, this court, by Justice Miller, said: "But these Indians (Cherokees) are within the geographical limits of the United States. The soil and the people within these limits are under the political control of the government of the United States or of the states of the Union. There exist within the broad domain of sovereignty but these two. There may be cities, counties, and other organized bodies with limited legislative functions, but they are all derived from, or exist in, subordination to one or the other of these. The territorial governments owe all their power to the statutes of the United States conferring on them the powers which they exercise, and which are liable to be withdrawn, modified, or repealed at any time by congress. * * * This power of congress to organize territorial governments and make laws for their inhabitants arises not so much from the clause in the constitution in regard to disposing of and making rules and regulations concerning the territories and other property of the United States as from the ownership of the country in which the territories are, and the right of exclusive sovereignty which must exist in the national government, and can be found nowhere else."—citing Murphy vs Ramsey, 114 U. S. 15, 44, 5 Sup. Ct. 747, 29 L. Ed. 47. In U. S. vs Rogers, 4 How. 567, 11 L. Ed. 1105, the chief justice said: "It is true that it is occupied by the tribe of Cherokee Indians, but it has been assigned to them by the United States as a place of domicile for the tribe, and they hold and occupy it with the assent of the United States, and under their authority. * * * We think it too firmly and clearly established to admit of dispute that the Indian tribes residing withing the territorial limits of the United States are subject to their authority." In Cherokee Nation vs Southern

Kan. R. Co., 135 U. S. 641, 10 Sup. Ct. 965, 34 L. Ed. 295, Justice
Harlan says: "The latest utterance upon this general subject is
in Choctaw Nation vs U. S., 119 U. S. 1, 27, 7 Sup. Ct. 75, 90, 30
L. Ed. 306, where the court, after stating that the United States
is a sovereign nation, limited only by its own constitution, said:
'On the other hand, the Choctaw Nation falls within the descrip-
tion in the terms of our constitution, not of an independent state
or sovereign nation, but of an Indian tribe.    As such it stands in a
peculiar relation to the United States.    It was capable, under the
terms of the constitution, of entering into treaty relations with
the government of the United States, although, from the nature
of the case, subject to the power and authority of the laws of the
United States when congress should choose, as it did determine in
the act of March 3, 1871, embodied in section 2079 of the Revised
Statutes (Ind. Ter. St. 1899, § 4289) to exert its legislative
power'."    It is well settled that an act of congress may supersede
a prior treaty, and that any questions that may arise are beyond
the sphere of judicial cognizance, and must be met by the political
department of the government.    "It need hardly be said that a
treaty cannot change the constitution, or be held valid if it be in
violation of that instrument.    This results from the nature and
fundamental principles of our government.    The effect of treaties
and acts of congress, when in conflict, is not settled by the con-
stitution.    But the question is not involved in any doubt as to its
proper solution.    A treaty may supersede a prior act of congress,
and an act of congress may supersede a prior treaty.    Foster vs
Neilson, 2 Pet. 253, 314, 7 L. Ed. 415; Taylor vs Morton, 2 Curt.
454. Fed. Cas. No. 13,799.    In the cases referred to, these prin-
ciples were applied to treaties with foreign nations.    Treaties
with Indian nations within the jurisdiction of the United States,
whatever considerations of humanity and good faith may be in-
volved and require their faithful observance, cannot be more
obligatory.    *    *    *    In the case under consideration the act of
congress must prevail as if the treaty were not an element to be

considered." Cherokee Tobacco vs U. S. 11 Wall. 616, 20 L. Ed. 227. That was a case where an act of congress extended the revenue laws as respected tobacco over the Indian territories, regardless of provisions in prior treaties that exempted tobacco raised by Indians on their reservations. Thomas vs Gay, 169 U. S. 271, 18 Sup. Ct. 340, 42 L. Ed. 740.

Such being the position occupied by these tribes (and it has often been availed of to their advantage), and the power of congress in the premises having the plenitude thus indicated, we are unable to perceive that the legislation in question is in contravention of the constitution, and the judgment of the court below is therefore affirmed.